179 So.2d 57

**Katie SAYRE**

**v.**

**Grace Louise DICKERSON.**

**I Div. 130.**

Supreme Court of Alabama.

Sept. 30, 1965.

J. Terry Reynolds, Jr., and Wm. Lauten, Mobile, for appellant.

Kilborn, Darby & Kilborn, Mobile, for appellee.

COLEMAN, Justice.

For prior decision on this appeal denying motion to strike demand for oral argument, see Sayre v. Dickerson, 275 Ala. 371, 155 So.2d 327.

The respondent appeals from a decree, in equity, whereby the court gave effect to an agreement allegedly made by the parties in settlement of a suit which arose out of conflicting claims of ownership of a parcel of land sometimes referred to as Point Legere or the Point, on Dog River.

The case may be more easily understood by reference to the following map.

The area shown is part of the land embraced in the map of a subdivision recorded in Map Book 3 at page 530. The parties allege that, in 1937, the map of the subdivision was filed for record by "A. H. Legere," as owner. His title is not disputed. Both parties claim through him.

The recorded map of the subdivision shows lots numbered from 1 to 5, both inclusive, and from 8 to 11, both inclusive, but does not show any lot numbered 6 or 7. The Dr. S. H. Stephens Lot is not numbered. The words Parcel No. 1 and Parcel No. 2 do not appear on the recorded map. The line running from north to south between the two parcels does not appear on the recorded map. The map here shown is the result of a survey made pursuant to the alleged agreement of the parties in the instant case, and the north-south line and the words Parcel No. 1 and Parcel No. 2 were placed on the map according to the survey. On the recorded map of the subdivision, the entire area embraced in Parcel No. 1 and Parcel No. 2, is shown simply as an unnumbered lot bounded by the Dr. S. H. Stephens Lot, the 20′ lane, lot 8, and Dog River.

In 1936, Legere conveyed to Seldon H. Stephens the Dr. S. H. Stephens Lot, by a deed which described the boundary by courses and distances.

Complainant alleges, and respondent neither admits nor denies, that, after the recording of the map of the subdivision in 1937, complainant acquired Lot 5; various other persons from time to time acquired the other numbered lots shown on the map; in 1947, complainant acquired the Dr. S. H. Stephens Lot; and Legere still owned the large unnumbered lot which is the area shown as Parcel No. 1 and Parcel No. 2 on the map set out in this opinion.

Complainant alleges that by deed dated July 3, 1947, she purchased from Legere, for $1,000.00, the land embraced in Parcel No. 1 and Parcel No. 2. A copy of the deed is made Exhibit B to the bill of complaint. The description in the deed is as follows:

". . . . the following described real property located in the City and County of Mobile, State of Alabama:

"Lot No. 7 in Point Legere Subdivision as the same is shown on a plat recorded in Map Book No. 3, page 530, Probate Records of Mobile County, Alabama."

Complainant alleges:

". . . . Through error or inadvertance the unnumbered lot shown on Exhibit A. fully described in paragraph 5 and referred to as the 'Point' was described in the deed Exhibit B as Lot 7 of the subdivision."

Respondent denies that complainant bargained to buy the lands embraced in Parcel No. 1 and Parcel No. 2; admits that Legere did sell to complainant "the lands referred to in the deed . . . . described as Lot seven . . . ."; denies that the lands conveyed were described as Lot Seven through error or inadvertence; and says that the land conveyed did not extend east so as to include, and Legere did not intend to convey, the land embraced in Parcel No. 1 and Parcel No. 2.

By deed dated November 23, 1949, Legere conveyed to respondent " 'any other real property in which the grantor herein has any interest whatever and which property is located in Mobile County, Alabama.' "

Legere died in 1950 leaving a will by which he devised to respondent all his property, except some property not here pertinent.

In brief outline the controversy is this. Complainant claims to own all of Parcel No. 1 and Parcel No. 2 by virtue of the July 3, 1947, deed. She seeks to reform the description in the deed and to quiet her title. Respondent says the July 3, 1947, deed did not convey all of both parcels to complainant, and that respondent, as successor to Legere, owns all of both parcels, or the greater part of them. It is apparent that the controversy results from the de-

scription in the deed referring to Lot No. 7, and the absence of any lot so numbered on the recorded map of the subdivision.

The case was set for hearing August 28, 1962. The transcript of the testimony taken on the hearing commences with the statement of counsel that "The parties have reached a settlement." Then, in open court, counsel dictate or recite the terms of the settlement.

The agreement, in short, is that a survey shall be made, to begin at the southeast corner of the Dr. S. H. Stephens Lot, thence run north along east line of said lot 130 feet, thence run east parallel with north line of Section 17 to the average tide line of Dog River. At the middle point of the line from Dr. S. H. Stephens Lot to Dog River, a line is to be run north and south to the river. All of the disputed land east of the north-south line will be the property of respondent and all west of the line will be property of complainant. The agreement, as written by the reporter and signed by the trial judge contains the following recitals:

"6. Katie Sayre waives for herself, her heirs, successors and assigns all right of ingress or egress which she may now have and any right she may now have or hereafter have to condemn a right of way for the purpose of ingress and egress over and across the property above described which shall be and become the sole property of Grace Dickerson, the waiver of said right expressly being a material part of this agreement and settlement, it being the intent hereof that the said Katie Sayre expressly disclaims for the present or future any right of ingress or egress to and from the lands to be conveyed to her or right to condemn any right of way to or from said lands or right of way of necessity thereto, or therefrom over and across any part or portion of the land to belong to the said Grace Dickerson.

"7. Costs of court to be taxed one-half to Grace Dickerson and one-half to Katie Sayre.

"8. The court is to partition the land pursuant to this agreement and the parties are in addition to the Court's partition to exchange deeds to the respective parcels as set out above.

"If any party should fail to execute the deeds required by this agreement within thirty days of the Court's decree partitioning the land, then the Register of this Court will be directed to execute deeds on behalf of the parties so refusing within thirty days of the date of the Court's decree or within any time after the Court's decree. Final decree of the Court in the cause shall expressly deal with the waiver of the right of ingress and egress to and from the property. The decree of the Court shall effectuate the provisions of this agreement."

Apparently, the surveyor agreed upon by the parties completed the survey and filed a map dated September 17, 1962. The map set out in this opinion is taken from the map dated September 17, 1962. By the agreement, Parcel No. 1 goes to respondent, subject to the agreement, and Parcel No. 2 goes to complainant.

On September 27, 1962, counsel, who had hitherto represented respondent, filed a written withdrawal from the cause alleging that respondent has been fully advised and that the withdrawal "is made at her request."

On October 5, 1962, through new counsel, respondent filed motion to set aside the submission, or suspend rendition of decree, or "to revoke the memorandum of settlement allegedly" made August 28, 1962.

As grounds of the motion, respondent says that she objects to and is not satisfied with the agreement; that it deprives her of property without due process; that the agreement was made "over her protest and without her consent or approval";

and that, if the agreement is permitted to stand, she and her successors will be unable to enter her property except by air or water, and that such condition would render her property worthless.

On October 26, 1962, hearing was had on the motion and on December 7, 1962, the court rendered a decree giving effect to the agreement of August 28, 1962.

Respondent appeals from the decree of December 7, 1962, and assigns its rendition as error.

Appellee moves to dismiss the appeal on three grounds.

First, appellee says that there has been no appeal from the "decree of August 28, 1962, and said decree has become final, more than six months having elapsed since the date thereof."

The paper of August 28, 1962, is entitled:

## "MEMORANDUM OF SETTLEMENT BETWEEN PARTIES"

As we read it, it sets out the terms of an agreement and is not a decree. The agreement is "ratified, adopted, affirmed" by the court, but, however final it may be as an agreement, it looks to the subsequent rendition of a decree and is not itself a decree. We do not think it is in such form that an appeal could be taken from it, and hold that the first ground of appellee's motion to dismiss is not well taken.

Second, appellee says that the appeal is an appeal from a consent decree and a consent decree will not support an appeal, citing Payne v. Graham, 20 Ala. App. 439, 102 So. 729, where the court said: "A consent decree or judgment will not support an appeal." The statement was made in answer to the argument that a certain Mississippi decree had been erroneously admitted into evidence. The Court of Appeals pointed out that " . . . this decree was never offered in evidence." Whether a decree, which was not offered in evidence, would or would not support an appeal was wholly unnecessary to the decision and is dictum.

Appellee cites also Heath v. Hall, 39 Ala.App. 623, 106 So.2d 38, where the Court of Appeals held that the appeal should be dismissed because there was "no actual controversy" and it was "impossible for this court to grant any relief because of the proceedings below . . . ." This is the only Alabama case we have found, or have been cited to, where an appeal from a consent judgment was dismissed.

Heath v. Hall, supra, relies on Gunter v. Hinson, 161 Ala. 536, 50 So. 86, where this court affirmed the decree of the trial court. With reference to a consent judgment, this court said:

" . . . Obviously, Laura B. Jones, even on appeal, could not have avoided the judgment rendered against her by her consent. That consent waived all and every irregularity preceding and was a release of errors. McNeil and Skinner v. State, 71 Ala. 71; Adler v. Van Kirk Land & Const. Co., 114 Ala. 551, 560, 561, 21 South. 490, 62 Am.St.Rep. 133." (161 Ala. at page 542, 50 So. at page 87)

In McNeil and Skinner v. State, supra, this court did not dismiss the appeal but affirmed a judgment rendered "by the consent of the appellants," in an action at law.

In Adler v. Van Kirk Land & Const. Co., supra, this court did not dismiss the appeal, but reversed and rendered a decree dismissing a bill to set aside a consent decree.

In Gossett v. Pratt, 250 Ala. 300, 34 So. 2d 145, this court affirmed a consent judgment.

In Grigsby v. Liles, 274 Ala. 67, 147 So. 2d 846, we held that the action of the trial court in vacating consent judgment and granting new trial must be regarded as correct unless such action constitutes an abuse of discretion or is plainly and palpably wrong.

In National Bread Co. v. Bird, 226 Ala. 40, 145 So. 462, this court refused to disturb an order granting a new trial.

In City of Bessemer v. Brantley, 258 Ala. 675, 65 So.2d 160, on the cross-assignment, this court said:

". . . . The judgment entry discloses that the reduction was made with the consent of the appellee. A party cannot appeal from a judgment or order to which he has consented. Badham v. Badham, 244 Ala. 622, 14 So.2d 730; Hinson v. Brooks, 67 Ala. 491; Winter v. Rose, 32 Ala. 447; Garner v. Prewitt, 32 Ala. 13; Townsend v. Jeffries' Adm'r, 24 Ala. 329; 2 Am.Jur. 974, Section 211; 4 C.J.S., Appeal and Error, § 213, pages 404, 407." (258 Ala. at page 682, 65 So.2d at page 166)

The authorities cited support the principle that a party cannot be heard to complain of action of the court which was done with the party's consent.

On the basis of the cases noted, we conclude that the proper disposition of an appeal from a consent judgment, which is truly a judgment rendered by agreement of appellant and not due to be disturbed, is to affirm the judgment and not to dismiss the appeal. The second ground of appellee's motion to dismiss is not well taken.

■ The third ground of appellee's motion to dismiss is that the December decree, here appealed from, is nothing more than a decree denying appellant's motion to set aside "the consent decree of August 28, 1962," citing Grigsby v. Liles, 41 Ala.App. 627, 147 So.2d 836, as authority that such decree is not appealable.

As already stated, we do not think that the Memorandum of Settlement Between Parties, dated August 28, 1962, is a decree. It must follow that the December decree is not a decree denying a motion to set aside a final decree. Appellee's third ground is not well taken. The motion to dismiss is denied.

■ Appellee has filed also a motion to strike the assignments of error for indefiniteness and as complaining of matters not assignable for error. Some of the assignments may be insufficient, but others are adequate. Assignments 1 and 6 recite:

"1. The court erred to the prejudice of the appellant (respondent) in entering an order or decree dated the 7th day of December, 1962 without giving the appellant (respondent) an opportunity to be heard in open court on the merits, and without giving her an opportunity to offer witnesses in her behalf in said cause. (T 62A–67)"

"6. The court erred in entering a decree which deprives the appellant (respondent) of the right of ingress·or egress to her real property and which forever barred and deprived her of the right in the future to seek a right of ingress and egress to her property by court action or otherwise. (T 62A–67)"

These assignments may not be models of good pleading but, we think, they sufficiently point out the error complained of. They complain of the action of the court in rendering the December decree. The motion to strike is denied.

■ We come to consider appellant's argument on the merits. She says, first, that the decree ought not to stand because she did not agree to the settlement made in court by her attorney on August 28, 1962, and that, because she did not agree to the settlement, it ought not to be binding on her. She states in brief:

". . . . If this court feels after reading the transcript in this case, that Mrs. Sayre, the appellant, is bound by an agreement which took her lands; which did not give her a day in court; which landlocked the land which she did receive; which deprived she (sic) and her heirs, successors and assigns (not parties to this agreement); a woman seventy-one years of age with

no way to reach her property except by helicopter or rowboat then certainly this court cannot by strain of the imagination find a sentilla (sic) of evidence indicating that Mrs. Sayre ratified such conditions at any time. To the contrary she repudiated them, preceding the signing of the agreement by the presiding judge."

It seems clear that on August 28, 1962, appellant was personally present in open court when the settlement agreement was made and dictated to the reporter by counsel. Later, after appellant had employed new counsel and had filed her motion to revoke the agreement, a hearing on her motion to revoke was held in open court on October 26, 1962.

Appellant testified ore tenus at the October hearing. The record indicates that, at the October hearing, appellant's counsel read aloud to her the Memorandum of Settlement, whereupon she testified on direct examination as follows:

"Q. Mrs. Sayre, are you agreebale to those provisions?

"A. I am not.

"Q. Were you at the time this matter came up in Court on its merits and it was discussed back and forth between you and your lawyer, Mr. Coley, and the other party involved, were you agreeable at that time to such conditions contained in this?

"A. No, I never was.

"Q. Did you say such?

"A. Through Mr. Coley. He kept saying it was the only thing I could do.

"Q. You did say yes?

"A. Yes, I said 'yes' under protest. I wasn't fully agreeable.

"Q. And you are not agreeable to it now?

"A. No sir."

On cross-examination, appellant testified as follows:

"Q. You were here in Court August 28, 1962, when this case was set for trial before Judge Simmons, the judge sitting here; you were here?

"A. Yes.

"Q. And we were in court room Number Five?

"A. Yes.

"Q. Do you recall on that occasion Mr. Coley and myself, Ben Kilborn, my brother, Vincent Kilborn, were in the back room and discussed this case while you waited in the case, do you remember that?

"A. Yes.

"Q. And it was a lengthy discussion held in the back room between Mr. Coley, my brother and myself and Judge Simmons?

"A. I guess so.

"THE COURT: In the presence of me?

"Q. In the presence of Judge Simmons?

"A. I guess so.

"Q. And your lawyer came out and told you what we had proposed to do, did he not?

"A. He came out about three times. I didn't agree to nothing.

"Q. Didn't Mr. Coley tell you this, that this is what we were proposing to do, have Point LeGuerre surveyed, split down the middle and you take the east part?

"A. Yes, Mr. Coley said that.

"Q. Mr. Coley told you that?

"A. Yes.

"Q. Mr. Coley went over this very agreement, read it to you; he went over the agreement at length?

"A. Not with that piece of paper.

"Q. I'm not asking about a piece of paper. He went over the agreement—

"A. No, he did not.

"Q. Some hour or more?

"A. No.

"THE COURT: You say he did or did not go over it with you, discuss with you about the agreement?

"A. Yes.

"Q. He recommended that you go along and settle this case as outlined in that agreement?

"A. He did.

"Q. He was your lawyer at that time?

"A. Yes.

"Q. And you agreed at that time?

"A. Not all together, I did not agree.

"Q. You didn't say you didn't like it?

"A. I said I don't like it, it's not fair, but he said that was the only thing to do.

"Q. And didn't you say, All right, we'll do it?

"A. I didn't say, All right. I just said: Well if it has to be it has to be.

". . . . . . . . .

"Q. Do you remember the Court Reporter was called in?

"A. I do.

"Q. Do you remember that Mr. Coley and my brother, Vincent, then dictated this agreement into the record?

"A. I wasn't paying any attention to that.

"Q. You were in the court room?

"A. I was in the court room but I didn't hear it. I didn't know I was supposed to hear it.

"Q. Did you have your ears stopped up?

"A. No I didn't have my ears stopped up.

"Q. You were there when it was dictated into the record, is that correct?

"A. Yes, I was there.

"Q. Did you rise in the court room and say: I don't agree to that?

"A. No, I didn't know what it was to agree to.

"Q. You just told me you were there.

"A. I didn't hear all that was said in this thing here.

"Q. You didn't?

"A. I didn't.

"Q. You're telling the court this lawsuit was being settled by your lawyer and you were in the court room approximately thirty feet wide and you didn't hear it? Didn't hear what was said?

"A. No. I heard a whole lot of talking but I couldn't tell you what was said.

"Q. Mr. Coley told you you would get the east half and Grace would get the west half, didn't he?

"A. Yes.

". . . . . . . . .

"Q. You were in the court room?

"MR. REYNOLDS: Object. Repetitious. She said she didn't hear it.

"A. I didn't hear it.

"THE COURT: All right, did you know the case was being settled?

"A. I knew something was going on, talking, I wasn't giving approval or nothing.

"Q. You didn't hear Judge Simmons say that that was the agreement of the parties?

"A. No, I didn't hear that.

"Q. You knew a survey was being ordered on this property?

"A. I heard that.

"Q. And you knew a survey was actually obtained?

"A. No I didn't, I've never seen it.

"Q. You knew Mr. Garret (Sic: Garratt) was going to be employed to make this survey?

"A. No, I did not.

". . . . . . . . . .

"Q. You know Mr. Garrett furnished a bill, sent a bill for the survey in the amount of $212.50, didn't you?

"A. I did not.

"Q. And it wasn't until after the survey was furnished to your lawyer, more than a month later that you decided you didn't like this agreement?

"A. No, I knew nothing of it; I heard nothing from my lawyer.

"Q. You didn't know the case had been set?

"A. No. I didn't know nothing about the bill or nothing.

"Q. You didn't know the case was being settled?

"A. I knew it was in the process. I didn't see the bill or nothing.

"Q. Yet you waited four or five weeks, all the way from August 28th, to the 5th of October, before you decided you didn't like this agreement, didn't you?

"A. No, I didn't like it at the beginning.

"Q. But you didn't do anything about dismissing Mr. Coley until when?

"A. Until about the 18th of September.

"Q. The day after the survey?

"A. I don't know what time the survey was made."

The map of Garratt's survey is dated September 17, 1962.

From appellant's testimony, it is apparent that she did not, on October 26, agree to the settlement made in August; but, even on October 26, she admitted, on direct examination, that in August, she had "said 'yes,'" although "under protest." On cross-examination in October, she testified that in August she had said: "Well if it has to be it has to be."

We are of opinion that appellant's own testimony shows that she was, on August 28, informed of the terms of the settlement and, at that time, agreed to it, although she agreed reluctantly. We think she did consent in August.

". . . . Consent removes or obviates mistakes or errors in the course of judicial proceedings. *Consensus tollit errorem,* is a conservative maxim of general application. If there be error in the judgment, the plaintiff and the Circuit Court were led into it by the consent of the appellants, a consent which involved an agreement on their part to waive, not to claim or take advantage of the error. The consent can not be withdrawn, and the judgments reversed at the instance of

either party." McNeil and Skinner v. State, supra, 71 Ala. at page 73.

We hold that, because appellant consented to the settlement, her contention, that the decree should be reversed on the ground that she did not consent, is not well taken.

On the merits, appellant's second contention is that the consent decree ought not to be allowed to stand because the agreement on which the decree is based deprives appellant, and her successors in title, of any way of ingress or egress by land and she can reach her parcel only by water or air. She argues to the effect that such an agreement is contrary to the public policy and, therefore, ought not to be enforced by the courts.

In this connection, we note appellant's motion to strike appellee's supplemental brief which was filed after oral argument. Appellant says the brief should be stricken because appellee did not file it within ten days after service of appellant's brief and because the proposition of law argued in the supplemental brief was not argued in appellee's original brief.

During oral argument, this writer inquired of counsel whether a landowner could waive or surrender a way of necessity. Appellee's supplemental brief undertakes to answer that question. Proposition 19 in appellee's original brief asserts that a person may waive the benefit of a statute or even of a constitutional provision enacted for his benefit.

■ When a party has timely filed his original brief, this court has rarely, if ever, refused to receive a supplemental brief that may be helpful. We do not think we should strike a supplemental brief which is filed in response to a question from the court and by a party who has timely filed all previously required briefs. Appellant's motion to strike supplemental brief is denied.

Appellant has cited many cases which have to do with common law and statutory ways of necessity.

"It has long been the law in this state, as well as in nearly every state in the Union, that, where a grantor sells land to another, which is surrounded, or partly surrounded by other lands of the grantor, and the grantee has no way of ingress or egress thereto or therefrom, except by traversing lands of the grantor or of strangers, right of way over the remaining lands of grantor exists by necessity. (Citations Omitted.)" Looney v. Blackwood, 224 Ala. 342, 343, 140 So. 400, 401.

In Dutton v. Taylor, 2 Lutw.R. 1487, one of the grounds, on which the existence of a way of necessity is placed, is that it is for the public good that the land be not unoccupied. Lide v. Hadley, 36 Ala. 627.

■ At common law, the right to a way of necessity does not arise where there is no privity of title. Trump v. McDonnell, 120 Ala. 200, 24 So. 353. § 56, Title 19, appears to eliminate the requirement of privity of title in certain cases outside corporate limits of a municipality. The law of this state does provide that a landowner shall have certain rights to common law and statutory ways of necessity.

We are not here concerned, however, with the question whether appellant, as owner of the seaward end of the peninsula, has a right to a way of necessity across the inland part of the peninsula. This is not a proceeding to acquire or protect a right of way. This proceeding was brought to settle a dispute as to ownership of the entire peninsula. The parties agreed to settle the dispute by dividing the peninsula between them with the condition that the owner of the seaward end should never have a right of way, either by common law or by statute, across the inland part of the peninsula. The question is whether such an agreement may be ratified by the court, or, is such an agreement that it contravenes public policy and is, for that

reason, void and unenforceable. Stated another way, may the owner of the seaward end of a peninsula waive and surrender, for himself and successors, the right to a way by land over the remainder of the peninsula?

We have found little, if any, authority in point. See: Thompson on Real Property, 1961 Replacement, § 368, Vol. 2, page 459; Ways of Necessity, Simonton, 25 Columbia L.R. 571, 584, 33 W.Va.L.Q. 64; 19 Oregon L.R. 363. This court has, with approval, quoted the following statements:

" 'It is a universally established rule that where a tract of land is conveyed which is separated from the highway by other lands of the grantor, or which is surrounded by his lands or by his and those of third persons, there arises by implication in favor of the grantee a way of necessity across the premises of the grantor to the highway. The basis of this right is the presumption of a grant arising from the circumstances of the case. Necessity does not of itself create a right of way, but it is evidence of the grantor's intention to convey one, and raises an implication of a grant. The presumption, however, is one of fact, and whether or not the grant is to be implied in a given case depends upon the terms of the deed and the facts in that case. Following the general rule above stated, a similar right may be created by implied reservation, notwithstanding general covenants in a warranty deed. The underlying principle is that whenever one conveys property, he also conveys whatever is necessary to its beneficial use, coupled with the further consideration that it is for the public good that land should not be unoccupied. . . . . Since the right of way is founded on a grant, it can arise only between grantor and grantee. No way of necessity can be presumed or acquired over the land of a stranger. . . . . '

. . . . ." Hamby v. Stepleton, 221 Ala. 536, 537, 538, 130 So. 76, 77.

Perhaps the strongest authority on the question is a Massachusetts case where the trial court denied petitioner's claim to certain rights of way. On appeal, the appellate court approved the ruling of the trial court and said:

"This is a petition for the registration of title to a tract of land in Medford containing about a quarter of an acre. It hereafter is referred to as the lot. It is surrounded by land owned by others, and does not abut on any public or private way. There is no easement of access to it from any public or private way discoverable on the records. The petitioner contends that there is appurtenant to it (1) a right of way over land of the respondent Twombly, or, failing in that, (2) an easement of necessity over land of the respondents Morrison and Berry. . . . ." Orpin v. Morrison, 230 Mass. 529, 530, 120 N.E. 183.

The court said further that a right of way of necessity over the land of the grantor is implied by law "because that is presumed to be the intent of the parties," and

". . . . Such a presumption ought to be and is construed with strictness. There is no reason in law or ethic why parties may not convey land without direct means of access, if they desire to do so. When a purchaser has voluntarily purchased land knowing its situation fully and that 'he had no access to the back part of it, but over the land of another, it was his own folly; and he should not burden another with a way over his land, for his convenience.' Gayetty v. Bethune, 14 Mass. 49, 56, 7 Am.Dec. 188.

"There are circumstances in the case at bar which apart from the oral testimony give color to the contention that the parties did not intend a right of way by necessity. But, however

that may be, the actual intention of the parties as disclosed by the oral testimony makes it plain that there was express understanding that there should be no right of way over other land of the grantor. Hence there is no right of way to the lot over land of Morrison and Berry." (230 Mass. at pages 533, 534, 120 N.E. at page 185)

In Doten v. Bartlett, 107 Me. 351, 78 A. 456, 32 L.R.A.,N.S., 1075, the court held that the defendants were bound by the recitals of a deed and mortgage executed by defendants. The court said:

". . . . But we can conceive of a case where the owner of the front lot would be willing to convey the rear lot provided there should be no right of way over the front lot, and the grantee would be willing to take his chances of procuring an outlet over some other adjoining land. Under such circumstances the deed might convey the rear lot and distinctly recite that there was granted no right of way of necessity or otherwise over the front lot. There can be no doubt that in such a deed there would be no implied grant, and the grantee would acquire simply what he had purchased —the lot without the way." (107 Me. at pages 354, 355, 78 A. at page 458)

In Haskell v. Wright, 23 N.J.Eq. 389, 396, the court denied a landowner the unrestricted use of a way, saying, "The defendant having accepted the conveyance of this lot, with a restricted right of way, is barred from claiming a larger way as a necessity."

Where part of a salt meadow was sold for a canal, the court held that the grantor, with respect to the remainder of the meadow, had no right to a way of necessity over and across the canal. The court said:

"When *Charles Knapp* sold and conveyed all the front of his land, he did it for a particular purpose, and for an adequate and corresponding con-

sideration. He understood that he was not to pass over the land, after the canal was made; and we know of no law which gives him, by implication, a right of way over other land of the grantee; though in fact, as a matter of favour, the plaintiff, and those under whom he holds, have been accommodated with a right of way to which they have no legal claim. . . . ." Seeley v. Bishop, 19 Conn. 128, 134.

In Powers v. Heffernan, 233 Ill. 597, 84 N.E. 661, 16 L.R.A.,N.S., 523, the court held that the purchaser had a right to use a stairway on an adjoining lot of the grantor, but the court said:

". . . . Necessity for, and right of, access may indeed be relinquished by express words clearly indicating an intention to do so, but general covenants which do not indicate that such relinquishment was in the mind of the covenantor will not be construed as a waiver of such necessary easements. . . . ." (233 Ill. at page 604, 84 N.E. 661, 664)

■ We think there are expressions in the cases next cited which support the principle that parties may, by express agreement, waive and relinquish the right to a way of necessity, to wit: Chappell v. New York, N. H. & H. R. Co., 62 Conn. 195, 24 A. 997, 17 L.R.A. 420; Baldwin Lumber Co. v. Todd, 124 La. 543, 50 So. 526; Myers v. Dunn, 49 Conn. 71; Bascom v. Cannon, 158 Pa. 225, 27 A. 968; Ewert v. Burtis, (N.J.Ch.), 12 A. 893; Lebus v. Boston, 107 Ky. 98, 51 S.W. 609, 52 S.W. 956; Golden v. Rupard, 80 S.W. 162, 25 Ky.L.Rep. 2125.

We note the following provision of the settlement agreement in the instant case, to wit:

"The surveyor will begin at the southeast corner of the lot shown on said map and formerly known as Dr. S. H. Stephens lot, and then run northwardly along the east line of said lot

130 feet to a point; from said point the surveyor will run a line easterly and parallel with the north line of Section 17, Township 5 South Range 1 West to the intersection of said line with the average tide line of Dog River;"

This provision leads us to conclude that the peninsula is surrounded by tidewater. All tidal streams are, prima facie, public and navigable. Walker v. Allen, 72 Ala. 456.

In Littlefield v. Hubbard, 124 Me. 299, 128 A. 285, 38 A.L.R. 1306, the court noted the rule that where land borders on the ocean, there exists no way of necessity even over a grantor's land, although such passage by water may not be as convenient as a passage by land. Citation to other cases relating to this rule may be found in the annotation.

We point out that we are not here deciding whether the owner of land bounded on three sides by water can obtain a way of necessity over the adjoining land as at common law or by our statute, § 56, Title 19. We do have to decide whether the agreement of such a landowner to release his right to a way over the adjoining land contravenes public policy. Littlefield v. Hubbard, supra, and similar cases indicate that such an agreement does not offend public policy and are cited for that reason.

One further consideration occurs to us. Suppose Parcel No. 1, on the map set out in this opinion, should be found to contain some valuable deposit which could be obtained and utilized only by removing the entire surface of Parcel No. 1 and causing it to be obliterated or covered by water. In such case, would not the owner of Parcel No. 1 have the right to destroy the entire surface so as to obtain the deposit? We think the owner would have that right, and if she does, then she would have the right to do something less than destroying the surface, that is,

to relinquish the right of way by land to Parcel No. 1.

No case or statute of which we know forbids a party from surrendering the right to a way of necessity. The right to such a way at common law rests on the implication that the parties intended and agreed to provide for such a way. If such a right rests on the implied agreement of the parties, then, if they are free to contract as they see fit, they must have the right to provide expressly that no way of necessity shall exist.

We are of opinion that the agreement to divide the peninsula did not offend public policy by imposing on the owner of Parcel No. 1, the condition that the owner, for herself and successors in title, should release the right to a way across Parcel No. 2.

Error not being shown, the decree appealed from is affirmed.

Motions denied.

Affirmed.

LIVINGSTON, C. J., and LAWSON, GOODWYN, MERRILL and HARWOOD, JJ., concur.